**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Case No. 13-cv-00066-MSK-MEH

**THE UNITED STATES OF AMERICA for the use and benefit of FISHER SAND AND**
**GRAVEL CO. d/b/a Arizona Drilling and Blasting, and**
**FISHER SAND AND GRAVEL CO. d/b/a Arizona Drilling and Blasting,**

      **Plaintiffs,**

**v.**

**KIRKLAND CONSTRUCTION, LLP, and**
**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 66)**, the Plaintiffs' response **(# 69)**, and the Defendants' reply **(# 75)**.

## FACTS

      The Court summarizes the pertinent facts here, and elaborates as necessary in its analysis.

In 2011, the Federal Highway Administration ("FHA") solicited bids for the construction of a

road in Hawaii.  Defendant Kirkland Construction, LLP ("Kirkland") was the successful bidder

for a portion of the project.  Kirkland subcontracted with Plaintiff Arizona Drilling and Blasting

("Arizona") for Arizona to perform certain blasting services.

      Arizona alleges that, over the life of the project, Kirkland breached the terms of the

subcontract in several ways, all to Arizona's detriment: (i) it directed Arizona to arrive on the

project site in October 2011, but then failed to commence the project until January 2012, causing

Arizona to incur losses due to idled equipment, lost opportunities, and increased explosive costs; (ii) it called upon Arizona to conduct blasting at "cut depths" shallower than what was called for in the project plans, increasing Arizona's costs and reducing its compensation (which was based on volume of rock removed); (iii) it failed to provide sufficient vehicle access to the job sites, requiring employees to hand-carry explosives to blast sites instead of delivering them by vehicle; (iv) it directed Arizona to perform work on an accelerated basis, but failed to pay premium compensation for such work; (v) it required Arizona to rent a hydraulic impact hammer and offered to share the cost of such rental, then refused to reimburse Arizona for any portion of the rental costs; (vi) it failed to provide work for Arizona in June and July 2012, causing Arizona to incur additional idling costs; (vii) it failed to obtain a contractually-required sales tax waiver.  In addition, Arizona contends that Kirkland failed to remit payment on "Pay Estimate 9," an invoice submitted by Arizona.[1]

Arizona's Amended Complaint **(# 34)** asserts three claims Kirkland: (i) breach of contract under Colorado law; (ii) breach of the implied covenant of good faith and fair dealing under Colorado law; and (iii) *quantum meruit*/unjust enrichment, presumably under Colorado law. In addition it asserts a claim under the Miller Act, 40 U.S.C. § 3131 *et seq.*, against Defendant Travelers Casualty and Surety Company of America ("Travelers"), as surety on a payment bond posted by Kirkland.

Kirkland moves **(# 66)** for summary judgment on each of Arizona's claims, arguing: (i) as to the breach of contract claim regarding Pay Estimate 9, Kirkland's obligation to pay never

---

[1]     Kirkland's motion argues that conditions precedent to its obligation to pay the invoice were not fulfilled by Arizona, relieving Kirkland of the obligation to pay.  Nevertheless, it notes that, following commencement of suit, it made payment to Arizona on the invoice.  In response, Arizona contends that Kirkland failed to pay certain sums of interest accrued on the invoice. Thus, a claim based on that invoice (and the need for resolution of Kirkland's defense) appears to remain extant.

2

arose because Arizona failed to execute a contractually-required release; (ii) as to the remaining breach of contract claims, Arizona failed to comply with a term of the contract requiring it to give written notice of any alleged breach to Kirkland within 10 days of the breach; (iii) as to the breach of the implied covenant of good faith and fair dealing claim, Arizona cannot show that the subcontract conferred discretion on Kirkland in any of the areas at issue and Arizona's contentions are contrary to express terms of the contract; (iv) the *quantum meruit* claim is not cognizable in light of an express contract governing the parties' obligations; (v) Kirkland is entitled to summary judgment on its affirmative defense of waiver, based on contractual terms; and (vi) the Miller Act claim fails because Kirkland is not obligated to Arizona in any way.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.  Breach of contract claims**

To establish a claim for breach of express contract under Colorado law, Arizona must show: (i) the existence of a contract; (ii) performance by Arizona of its obligations or some justification for its non-performance; (iii) non-performance of its obligations by Kirkland; and (iv)  resulting damages.  *Western Distributing Co.  v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).   It is not disputed that a contract existed between the parties, and, except as noted below,

Kirkland does not dispute, at least for purposes of this motion, that it breached that contract.  Its primary argument is that Arizona cannot show the second element: that Arizona complied with all of the contract's requirements.

1.  Pay Estimate 9

Turning first to the breach of contract claim arising out of Pay Estimate 9, Kirkland contends that Arizona cannot establish that it fully performed under the contract.  In pertinent part, Kirkland argues that the undisputed facts show that Arizona failed to comply with a condition precedent to payment contained in Paragraph 3(c) of the contract.

Paragraph 3(c) provides that Kirkland's obligation to pay Arizona's invoices arises "only when all conditions of this contract relative to sales tax information, payroll reporting requirements, insurance certificates, bond requirements, progress statement format and procedure, previous payment certification, releases of claims and satisfactory rate of progress have been met."  (Emphasis added.)   Although this paragraph refers to "releases of claims" that are "conditions of this contract," Kirkland has not pointed the Court to the specific contractual provision that defines the obligations of Arizona with regard to any "releases of claims," much less specifies any required content and timing of such releases.

The "release" in question appears to be a document entitled "Release and Certification of Payment" which, at least as a matter of practice, Arizona's representative submitted with each invoice, agreeing to "waive[ ], release[ ], and relinquish[ ] all rights and claims . . . against [Kirkland]" in exchange for payment of the invoice.  The record reflects that, initially, Arizona's principal, Luke Meister, added language to the release reading "This payment does not reflect the outstanding claim amount." However, there appears to be some dispute between the parties as to whether Mr. Meister ever actually signed (electronically or otherwise) the modified release.

5

Ultimately, the parties' jockeying over whether or not Mr. Meister signed the modified release is irrelevant. Paragraph 3(c) of the parties' contract requires Arizona to submit any "releases of claims" that are "conditions of th[e] contract" in order to cause Kirkland's payment obligations under the contract to mature. However, Kirkland has not identified any contractual provision that specifies the time or contents of the referenced release, nor explained how the required release differed from what Arizona submitted. As a consequence, Kirkland has not shown that Arizona failed to comply with all "conditions of the contract". Accordingly, the Court denies Kirkland's motion for summary judgment with regard to the breach of contract claim relating to Pay Estimate 9.

2. <u>Remaining alleged breaches</u>

As to the remaining claims by Arizona for breach of contract, Kirkland concedes (or, at least for purposes of this motion, does not dispute) that it arguably breached the contract as Arizona contends. However, Kirkland argues that Arizona is precluded from obtaining relief under a breach of contract theory because it failed to comply with its own contractual requirement to give prompt, written notice to Kirkland of any alleged breach.[2] That obligation is primarily encompassed by Paragraph 21 of the parties' agreement, which reads:

> It is understood and agreed that notice of any damage which
> [Arizona] alleges [Kirkland] or other Subcontractors have caused
> him or are causing him must be filed in writing with [Kirkland]
> within ten days from commencement of such alleged damage and a
> full accounting filed within ten days after the extent of damage is

---

[2]     Later in its motion, Kirkland largely repeats this argument, casting it as an affirmative defense of "waiver." Ordinarily, a waiver is an intentional relinquishment of a known right. *Grimm Const. Co. v. Denver Bd. of Water Commissioners*, 835 P.2d 599, 602 (Colo.App. 1992). Whether the failure to act constitutes an intentional relinquishment is a factual issue. *Id.* However, because the Court finds that written notice was required and was not given, whether the failure to give notice was intentional is irrelevant. Thus, the Court does not address Kirkland's "waiver" argument separately.

> known or the cause of the damage ceases, otherwise, same will be
> considered void by both parties.

Both parties appear to agree that they interpret Paragraph 21 as requiring Arizona to give prompt written notice of any alleged breaches of the contract to Kirkland.  Moreover, although the parties have not addressed the question, the Court assumes Arizona to concede that a failure to give <u>timely</u> notice operates to waive the alleged breach entirely (*i.e.* that the breach "will be considered void"), rather than to postpone Arizona's ability to sue on the breach until such time as proper notice is given.[3]

Arizona does not dispute that, as to most of the alleged breaches, it failed to give timely written notice of its concerns to Kirkland.  Instead, Arizona argues that "a party's actual knowledge of the facts giving rise to a claim for additional compensation excuses strict compliance with a notice provision," citing *URS Group, Inc. v. Trta Tech, FW, Inc.*, 181 P.3d 380, 388 (Colo.App. 2008), and *Appeal of C&L Constr. Co.*, 81-1 B.C.A. ¶ 14943, 1981 WL 7539 (1981) (Armed Servs. Bd. of Contract Appeals 1981),  among others.  These cases, all of which involve contractors on government construction contracts making claims for "additional compensation," are inapposite for several reasons.

First, none of the cases purport to arise under  or apply Colorado law.  Several are decisions by Administrative Law Judges of various federal boards overseeing contract appeals and rely on largely administrative precedent; others are state law cases purporting to apply the law of states other than Colorado or, in the case of *URS Group*, "federal case law addressing

---

[3]     Arizona tendered a comprehensive written notice of alleged breaches and claimed injuries to Kirkland on November 2, 2012.  Arizona has not meaningfully argued that this written notice, that is clearly untimely, is sufficient to discharge Arizona's obligations under Paragraph 21.

government contract issues when there are no applicable New Jersey state court decisions."[4]  181 P.3d at 384.

Second, and more importantly, nearly all of the cases involve the contractor invoking a standard "differing site conditions" ("DSC") clause in the contract as the grounds for additional payment.  As explained in *URS Group*, normally, a contractor who enters into a fixed-price contract "assumes the risk that its cost of performance will be higher than the contract price" and cannot allege a breach of contract if unforeseen circumstances complicate its performance.  181 P.3d at 385.  However, certain types of federal construction contracts are required to contain a DSC clause that provides that "if the conditions do materially . . . differ and cause an increase or decrease in the Contractor's cost of  [performing work], an equitable adjustment shall be made under this clause." *Id.*, *citing* 48 C.F.R. § 52.236-2 and 48 C.F.R. § 36.502.  To invoke a DSC clause, the contractor must "promptly, and before conditions are disturbed, give written notice to the Contracting Officer of [the] subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." *Id.*  The purpose of such a clause is to "take at least some of the gamble on subsurface conditions out of bidding," thus keeping contractors from inflating their bids to account for unknown subsurface contingencies that may never manifest. *Id.*  Because DSC clauses are intended to serve specific purposes, courts are "reluctant to frustrate the purpose . . . by relying either on other contractual provisions that shift liability to the contractor to investigate site conditions or on broad general exculpatory clauses in the contract." *Id.* at 386.  Thus, in *URS Group* and the other cases cited by Arizona, courts generally hold that

---

[4]      It is not clear whether Arizona is arguing that, as a matter of law, terms that are common or standard in governmental construction contracts are construed differently than they might be under ordinary state contract law.  Even if Arizona was making such an argument, it has not made any showing that the terms of the Arizona-Kirkland contract contain those same common or standard terms.

" the notice need not be in any particular form. All that is necessary is that the government—or, here, the program management contractor—be generally informed of the facts surrounding the claim" and "must merely make the Contracting Officer aware of the differing site condition." *Id.* at 387-88.

Thus, these cases are distinguishable from this one.  The language at issue here – Paragraph 21 of the Arizona-Kirkland contract – is not a DSC clause, nor is it apparently intended to operate like one.  A DSC clause is designed to give a Contracting Officer knowledge of a claim of circumstances previously unforeseen to all parties, allowing it to "investigate the site conditions promptly" and ascertain whether the requisite criteria are met to entitle the contractor to a mandatory "equitable adjustment" of the contract terms.  48 C.F.R. § 52.236-2(b). In essence, the DSC clause is the means by which a contractor and the Contracting Officer remedy a mutual mistake of fact as to the actual site conditions.  In contrast, Paragraph 21 clearly has a purpose of giving Kirkland prompt notice that Arizona is alleging that it has suffered a loss and/or suffered from a breach of the contract – that is, an allegation of culpable conduct on Kirkland's part.  As such, the notice called for in Paragraph 21 is presumably designed to give Kirkland the opportunity to preserve evidence, to prepare a defense, to notify its insurers, to compromise a claim in whole or part, to investigate any counterclaims or offsets, and perhaps even to begin efforts to secure a replacement subcontractor,[5] all tasks unrelated to invocation of a DSC clause. Consequently, although informal notice might be sufficient to comply with a DSC clause, this Court is not convinced that the same rationale warrants excusing Arizona's non-compliance with the requirement of written notice as contained in Paragraph 21.

---

[5]      After all, if Arizona declares Kirkland to be in material breach of the parties' contract, Arizona has the option to cancel its own future performance.  *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F.Supp.2d 1238, 1244 (D. Colo. 2013).

Third, the Court is reluctant to read out the requirement of written notice in Paragraph 21, particularly in light of the additional provisions of Paragraph 19 of the Arizona-Kirkland contract, which states:

> It is specifically understood that no verbal . . . notice by either party to the other party shall be of affect (sic) or binding.  Both parties agree that they will execute and deliver in writing all communications from them by which the other side is to be . . . notified . . . and when same are given verbally they shall be held as not material or binding.

Thus, Paragraph 19 serves as a second, separate indication that the parties intended to ensure that any notice owed under the contract by Arizona to Kirkland would be supplied in writing, and that the parties agreed to prohibit oral notifications.   Under these circumstances, the Court rejects Arizona's argument that oral notice (or even constructive notice) to Kirkland of alleged breaches was sufficient to comply with the terms of the parties' contract.   The parties agreed, in multiple portions of the document, that Arizona would give prompt, written notice of alleged breaches to Kirkland, and thus, that is what is required.

Arizona offers an argument in the alternative: assuming that written notice of an alleged breach was required by Paragraphs 19 and 21 of the contract, Kirkland nevertheless waived its right to demand such notice, either expressly or by conduct (that is, because Kirkland's representative, Baxter Kirkland, was verbally "abusive" of Arizona's representatives and employees).  Arizona's brief contends that, in or about October 2011, Mr. Kirkland told Mr. Meister "not to make claims for damages on the Project."  Arguably, such a contention might arguably permit a conclusion that Mr. Kirkland waiving Kirkland's rights to receive written notice of alleged breaches under Paragraphs 19 and 21of the contract.  However, the evidence to which Arizona cites in support of this contention does not reflect Mr. Kirkland making such a categorical statement.  Arizona cites two pieces of evidence: (i) paragraph 13 of Mr. Meister's

affidavit, which states that Mr. Kirkland "was unwilling to discuss [Arizona's] claim for damages related to startup delay" and "admonished me . . . for starting the Project by making a claim for additional compensation," but does not assert that Mr. Kirkland instructed Arizona not to provide any further notices of alleged breaches; and (ii) Mr. Kirkland's own deposition testimony, in which Mr. Kirkland states that he "shut [Mr. Meister] down immediately" when he asked for additional compensation for the startup delay, but does not testify as to making any statement that could reasonably be construed to waiver Kirkland's rights to receive notice of any alleged contract breaches in the future.   It may very well be that Mr. Kirkland was hostile or abusive towards Mr. Meister and others, or that he bristled at or even resisted allegations that his company was in breach of the contract, but the Court cannot conclude that such behavior constitutes a waiver (intentional relinquishment of the clearly-expressed contractual obligation) of Arizona to give written notice of any alleged breach.

Accordingly, the Court finds that Arizona is obligated to demonstrate that it served Kirkland with written notice of each alleged breach of the contract, and that such notice occurred within 10 days of the commencement of that breach.  The Court then turns to the specific evidence underlying each of Arizona's alleged breaches.

a. Delay in commencing work

Mr. Meister's affidavit states that he and Kirkland representatives attended a pre-construction meeting on October 25, 2011, at which time Kirkland advised Arizona of its inability to commence Arizona's portion of the job until January 2012.  On October 26, 2011, Mr. Meister wrote to Kirkland's principals via e-mail, expressing "concerns about the impact the delay to the project will have on us," including depreciation on the idle equipment and "lost production from this schedule delay or inability to work the equipment elsewhere."  Mr. Meister

invited Kirkland to "give me your thoughts on how Kirkland can help [Arizona] in this matter." Although Mr. Meister's e-mail does not expressly identify the delay as being a breach of the parties' agreement, it does appear to conform to the contract's requirement that it give notice to Kirkland that Arizona was suffering injuries because of conduct committed by Kirkland and expressly identified the nature of those injuries (depreciation, lost work opportunities). Moreover, it is clear that this written notice was served upon Kirkland within 10 days of Arizona's discovery of the injury.

Kirkland responds that the initial startup delay in October 2011 cannot constitute a breach of the parties' agreement because the parties did not sign the subcontract until December 2011. This argument is without merit for at least two reasons. First, Kirkland has had notice since the outset of this case that Arizona was claiming the initial delay as a breach of the contract, yet Kirkland's initial summary judgment motion did not argue that a breach of contract claim of this type was not cognizable because no contract existed at the time. Kirkland's current argument – that the delay predated the execution of the contract – is thus raised improperly for the first time in its reply brief. It is axiomatic that the Court does not consider such untimely arguments. *See Water Pik, Inc. v. Med–Systems, Inc.,* 726 F.3d 1136, 1159 n. 8 (10th Cir. 2013). Second, although not executed until December 2011, the contract, by its own terms, states that it is "dated 10-27-11." Thus, there is some basis to conclude that the parties intended the contact, once signed in December 2011, to take effect retroactive to October 27, 2011 (if not earlier, given that the parties signed a Letter of Intent to enter into a contract as early as October 16, 2011). In any event, the Court sees no reason how arguably premature written notice by Arizona of an ongoing breach by Kirkland deprived Kirkland of the benefits of Paragraphs 19 and 21. Thus, Arizona's breach of contract claim predicated on the initial startup delay shall proceed to trial.

b. <u>Shallow cut depths</u>

The record is somewhat unclear when Arizona first concluded that Kirkland was presenting it with cut depths that were too shallow compared to those called for by the project plans.  Mr. Meister's affidavit states that "At the beginning of [Arizona's] work on the Project, I personally informed [Kirkland] that the cut depths were shallower than anticipated," and that this situation persisted "[t]hroughout the Project."  Thus, the Court will assume that Arizona's obligation to give written notice of this concern first matured in or about January 2012.

Arizona does not point to any written notice to Kirkland of its concerns about shallow cut depths in or about January 2012.  Of the written communications attached to Mr. Meister's affidavit, the first one that even mentions shallow cut depths is dated March 8, 2012, and that e-mail simply recounts a conversation between Mr. Meister and Kirkland's principal about "oversize material generated out of the many shallow cut areas we have encountered," along with Mr. Meister confirming that such oversized material "will not be a problem."  Arguably, the first written communication in the record expressly identifying shallow cut depths as a potential breach of the contract is an August 14, 2012 e-mail from Mr. Meister to Kirkland, attached to Kirkland's initial motion.  That e-mail reads "we need to discuss our position in regards to costs and unexpected shallow cut depths over the majority of the job."  Thus, August 14, 2012 is the first date on which Arizona arguably gave written notice to Kirkland about shallow cut depths being a potential breach of the parties' agreement.

Even if the Court were inclined to regard oral notice to Kirkland of an alleged breach as a substitute for the written notice required by the contract, the Court would nevertheless find that the discussions between  Arizona and Kirkland representatives about the shallowness of the cut depths Arizona was expected to blast do not constitute notice to Kirkland that Arizona

considered those shallow cut depths to constitute a breach of Kirkland's obligations under the contract.  Mr. Meister's affidavit states:

> At the beginning of Arizona Drilling's blasting work on the Project, I personally informed Baxter Kirkland that the cut depths were shallower than anticipated based on the Plans and Specifications. . . I made Kirkland aware that the shallow cuts were more costly to Arizona Drilling and were resulting in rock fragmentation that resulted in larger rocks than expected.  I also communicated to Kirkland that Arizona Drilling would modify its blast plans to try and achieve better rock fragmentation.  I also informed Kirkland that the rock fragmentation would improve if Kirkland left deeper cut depths.   Kirkland was unwilling to leave more overburden/deeper cut depths so that the efficiency and results of rock blasting would improve.

To fully effectuate the purposes of Paragraph 21 of the parties' contract, it is essential that, when communicating with Kirkland, Arizona gave some indication to Kirkland that it considered the excavation depths to not just be unexpected, inconvenient, or presenting additional difficulties, but to express Arizona's belief that Kirkland was <u>obligated</u> by the contract to take some other action than it was taking. In this regard, the conversations recited in Mr. Meister's affidavit failed to give Kirkland notice that Arizona considered that, by over-excavating the cut depths, Kirkland was in breach of an obligation it had agreed to in the contract.  Certainly, Mr. Meister informed Kirkland that it expected the cuts to be deeper and that shallower cuts make blasting more expensive, but Mr. Meister's recitation of the conversation does not recite any instance in which he informed Kirkland that Arizona believed that Kirkland was <u>obligated</u> by the terms of the contract to provide deeper cuts.  If anything, Mr. Meister's version of the conversation suggests that Arizona was willing to modify its performance to improve the situation, rather than to stand upon its perceived contractual right to demand deeper cuts.  Accordingly, the Court cannot say that Mr. Meister's oral communications with Kirkland

constituted substantial performance of the notice obligations contained in Paragraphs 19 and 21 of the contract.

Thus, the Court finds that there is no genuine dispute of fact that, with regard to its complaint that shallow cut depths constituted a breach of the parties' agreement, Arizona failed to give the notice of that alleged breach as required by Paragraphs 19 and 21 of the contract until at least August 14, 2012.  Kirkland is entitled to summary judgment on Arizona's breach of contract claim relating to shallow cut depths with regard to any such breaches that occurred more than 10 days prior to August 14, 2012.[6]

c. Access to job site.

Arizona contends that Kirkland contractually agreed to ensure that Arizona's trucks and tracked vehicles could reach the jobsite. Specifically, an un-numbered paragraph in the contract, under the heading "Clarifications," reads "access to work sites will be suitable for tracked drills and support vehicles on their own power."  However, Arizona states that Kirkland often failed to clear a path to the jobsite to permit such access, requiring Arizona to often hand-carry its tools and materials to the jobsite, presumably causing Arizona some injury in expense or production delay.  As with the claim relating to shallow cut depths, Kirkland concedes (for purposes of this motion) that such conduct might constitute a breach, but argues that Arizona failed to comply with conditions precedent to suit by failing to give written notice of that alleged breach as required by Paragraph 21 of the contract.

The deposition testimony of Jeff Freadrich establishes that this problem first manifested itself in or about January 19, 2012, and continued periodically over the remainder of the project.

---

[6]     The parties have not addressed, and thus the Court does not opine, as to whether Arizona could assert a breach of contract claim stemming from shallow cut depths if those cut depths occurred on or after August 4, 2012.  Nor does the Court necessarily find that the August 14, 2012 correspondence is itself sufficient to give the required notice.

The record does not reflect any contemporaneous written notice by Arizona to Kirkland of the situation.  According to the record, the issue was raised in writing for the first time in Mr. Meister's August 14, 2012 e-mail to Mr. Kirkland, in which Mr. Meister states "we need to discuss our position in regard to costs . . .  due to . . . access unsuitable for the bulk truck and excessive hand work to load holes."  Thus, although Arizona might have a cognizable breach of contract claim to the extent that Kirkland continued to provide inadequate access to the jobsite on or after August 4, 2012, Arizona's claim for breach of contract premised on inadequate access prior to this date is precluded by Arizona's failure to give prompt written notice of that concern.

Again, even if the Court were to consider whether oral notice about this issue by Arizona to Kirkland could substitute for written notice, the Court would nevertheless conclude that even the oral notice was insufficient.  There is evidence in the record that in January 2012, Mr. Freadrich spoke to both Kirkland Representative Tony Daub and to Mr. Kirkland himself about the access situation.  Mr. Freadrich's testimony is that he told Mr. Daub that Arizona had a "problem with truck access and we could not get the vehicle onto the shots most of the time" and that "if the access for the drills is difficult, that means we can't get on with the bulk truck to load it because the drills can't get around."  At no point did Mr. Freadrich represent to Kirkland that he believed that Kirkland's failure to provide sufficient access constituted a breach of the contract,[7] or otherwise assert to Kirkland that Arizona believed that the inadequate access would expose Kirkland to a claim for damages.  Similarly, Mr. Meister's affidavit states that "I informed Baxter Kirkland of the poor site access and requested that Kirkland provide better

---

[7]     Mr. Daub testified, without apparent dispute by Mr. Freadrich or others, that Kirkland offered to smooth out access roads with additional soil and material to provide for better access. Indeed, according to Mr. Daub, Kirkland did so on one occasion, only to have Arizona discover that the additional backfilled material would cause holes drilled for blasting charges to collapse. Thus, contended Mr. Daub, Arizona rejected the idea ("I could fix it to where he could get to the holes.  But he didn't want us to, because he couldn't hold the holes.")

access so that Arizona Drilling's support vehicles could reach the drill sites.  Kirkland was

unwilling to provide better site access and Kirkland's position was that Arizona Drilling should

deal with the site conditions that existed."  Again, the record does not reflect that Arizona ever

orally informed Kirkland of its belief that the inadequate access constituted a material breach of

the agreement.  Certainly, there is evidence that Kirkland was aware of the situation, and was

even aware of Arizona's dissatisfaction with the situation, but without some evidence that

Arizona affirmatively advised Kirkland of its belief that the failure to better access would render

Kirkland in violation of the contract, the Court cannot say that Arizona substantially complied

with the notice requirement of Paragraph 21.  Accordingly, Kirkland is entitled to summary

judgment on that portion of the breach of contract claim relating to inadequate access.

### d.  Accelerated work

Another portion of the "Clarifications" section of the contract provides that "[w]orking

days can be accelerated at [Kirkland's] option, additional compensation will apply."  Arizona

contends that Kirkland specifically directed it to accelerate its work at one point during the

project.  It points to Mr. Meister's affidavit, which states "On February 7, 2012, Baxter Kirkland

. . . indicated Kirkland needed more blasting production.  Subsequently, we discussed that

Kirkland was accelerating Arizona Drilling's work to achieve more production.  As a result,

Arizona drilling accelerated its work by adding additional shifts, working nights, and adding

additional workers."

This claim is addressed in a somewhat abbreviated fashion in Arizona's response brief,

leaving some uncertainty as to precisely what the breach in question is.  Taking Arizona's

contentions – that Kirkland directed it to accelerate its work, perhaps beginning as early as

January 2012 – as true, the giving of such a directive by Kirkland is not, of itself, a breach of the

contract; rather, an instruction to accelerate simply exposed Kirkland to an obligation to pay some unspecified "additional compensation."  The record does not reflect whether, and more importantly, when Arizona billed Kirkland for this additional compensation, much less reflect when Kirkland refused to pay it.  (It is this refusal to pay that would seem to constitute the breach in question.)

Similarly, Kirkland's motion does not address this claim in sufficient detail to permit the Court to evaluate Kirkland's request for summary judgment.  As noted above, the only defense that Kirkland has sought summary judgment on is the contention that Arizona failed to give the written notice required by Paragraph 21 of the contract.  It is not necessarily clear to this Court whether Paragraph 21's notice requirements would apply to situations in which Kirkland allegedly failed to make payment on an invoice submitted after the work has been completed. Accordingly, the Court declines to enter summary judgment on this portion of the breach of contract claim at this time, but advises the parties that this claim, and any defenses thereto, will have to be developed and described in greater specificity in the Proposed Pretrial Order and may, if insufficiently supported, result in a granting of judgment as a matter of law pursuant to Fed. R. Civ. P. 50 at the time of trial.

e.  Rental of hydraulic impact hammer

In March 2012, Kirkland wrote to Arizona, complaining that the rock fragments produced by Arizona's blasting were too large.  It suggested that Arizona "rent a machine" – a hydraulic impact hammer – "to bring your company into compliance."  Kirkland's e-mail went on to state "we even went so far as to sty  we would sublease the machine from you when you are in compliance to help off set your cost's (sic) as we have a need for another machine but not on a regular basis."  Mr. Meister responded in writing that Arizona had "solicited our own quotes for

18

hammer rentals," but inquired "if we do rent a hammer, how much do you anticipate needing it? What size hammer would be best for your operations?"  Mr. Meister's affidavit states that he had subsequent discussions with Kirkland that that Mr. Kirkland "agreed to rent [the impact hammer] from Arizona Drilling when Arizona Drilling was not using it."  Arizona now contends that Kirkland refused to pay for its share of the rental of the impact hammer and failed to pay for certain damages that Kirkland caused to the hammer.

Kirkland's summary judgment motion does not treat this claim differently than the other claims on which it seeks summary judgment: it joins the claim relating to the impact hammer with the other breach of contract claims, arguing that Arizona failed to give Kirkland a notice of breach as required by Paragraph 21 of their agreement.  But the record reflects that the agreement between Arizona and Kirkland over the rental of the impact hammer has nothing to do with the subcontractor agreement; rather, the rental appears to have occurred pursuant to a separate, oral agreement reached between Mr. Meister and Mr. Kirkland in March 2012.  The record does not reflect that this oral agreement included anything but the most basic bargain: if Arizona rented the hammer, Kirkland would rent it from Arizona when Arizona was not using it. There is no indication that the parties bargained for any additional terms, such as terms requiring notice from one party to the other in the event of an alleged breach.  Thus, Arizona has adequately demonstrated a genuine issue for trial on this claim: that it rented the hammer and allowed Kirkland to make use of it, but that Kirkland failed to comply with its own obligation to make rental payments for such use.  Accordingly, this breach of contract claim will proceed to trial.

f.  Delays in work

This particular claim is stated only in most cursory terms in Arizona's brief.  In early

June 2012, Mr. Kirkland contacted Mr. Meister and informed him that, based on the project's

work sequence, "there would not be work for Arizona Drilling to perform" between June 13,

2012 and July 8, 2012.  Arizona apparently considers this a breach of an unspecified provision of

the contract,[8] and contends that it "provided Kirkland with its standby costs," although it does

not cite to evidence supporting that contention.  The record does not reflect when, or even if,

Arizona gave written notice to Kirkland in June 2012 that the delays would constitute a breach of

the contract (or even that the parties orally discussed the delays as being an alleged breach).  In

the absence of evidence of such notice, Kirkland is entitled to summary judgment on this portion

of the breach of contract claim.

g.  Explosives cost increase

Arizona contends that, due to the late start of the project, it was unable to purchase the

necessary explosives in 2011, and instead had to obtain the explosives under higher prices in

2012.  Arguably, this issue does not present a distinct "claim" for breach of contract – Arizona

does not, for example, point to a term in the contract that required Kirkland to take action in

order to permit Arizona to purchase explosives at 2011 prices – but rather constitutes a separate

item of damages incident to Arizona's claim that the delay in commencing operations was a

---

[8]     Notably, Paragraph 21 of the contract provides that "[Arizona] agress to make no claims
against [Kirkland] if his schedules or schedules furnished from time to time by [Kirkland] are not
adhered to, it being understood that [Kirkland] will endeavor to expedite completion of teh
project as rapidly and possible and in so endeavoring may prepare schedules that in all cases may
not be adhered to.  [Arizona] hereby waives any and all claims and released [Kirkland] from any
delays and extra costs attributable to interference or failure to coordinate."
     At the same time, the "Clarifications" section of the contract states that Arizona's "prices
are based on continuous work.  Prices exclude standby time caused by site access limitations or
other delays caused by others." It is not clear how, or if, these two provisions may be reconciled.

breach of the contract.  As noted above, Arizona gave sufficient written notice to Kirkland that it considered that delay to be a breach of the contract, and, arguably, Arizona may also seek the increased explosive costs as another item of damages in that claim.[9]

h.  Sales tax

Arizona's final breach of contract claim is described in a mere 20 words in its response brief: "The Subcontract states that Arizona Drilling's prices exclude taxes.  Kirkland never obtained a sales tax exemption like it was required."  (Citations omitted.)

It is difficult to conform the argument in Arizona's brief, the evidence in the record, and the terms of the contract.  Notwithstanding the quote above from Arizona's brief (which makes reference to a 'sales tax exemption,' the relevant portion of Mr. Meister's affidavit cited by Arizona speaks of a different issue:

> [Arizona] seeks damages for Hawaii general excise tax it paid on revenues from the Subcontract.  The Subcontract states that [Arizona's] prices exclude taxes.  Kirkland was supposed to obtain an excise tax exemption for [Arizona] but it never did.  As a result, [Arizona] paid $ 64,769 in excise tax that it should not have had to pay.

The relevant contractual provision is found in the "Clarifications" section, and reads, simply, "Sales tax is excluded from above pricing."  The contract does not contain any express terms requiring Kirkland to "obtain a sales tax exemption" or make any references to "excise taxes."

Without attempting to untangle this claim, the Court observes that Arizona has failed to come forward with evidence that it ever informed Kirkland, in writing, that it believed

---

[9]     Mr. Meister also states that he "personally communicated the price increases in exploses to Ronda Neumeister [of Kirkland] in late January or early February 2012 [and] discussed Kirkland paying for the price increase."  It is not clear whether Mr. Meister's "communication" with Ms. Neumeister was oral or in writing; if the latter, the correspondence as described by Mr. Meister would itself seem to comply with Arizona's notice requirements under Paragraph 21 of the contract.

Kirkland's failure to obtain a sales tax or excise tax exemption certificate constituted a breach of the contract.  At best, Arizona points to a January 25, 2012 e-mail from Mr. Meister to Kirkland stating "I was following up to see if you have found anything for an exemption or regulation that exempts us as the subcontractor charging Kirkland Sales tax, which most DOT projects facilitate as a Prime Contractor Exemption being responsible for the gross receipts on the project." Construed most favorably to Arizona, this e-mail is merely an inquiry as to whether it is possible for Kirkland to obtain some kind of exemption, or to otherwise assume certain tax costs.  The e-mail is not susceptible to an interpretation that Arizona is attempting to notify Kirkland that Arizona believes that the failure to obtain such a tax exemption would constitute a breach of the parties' contract.  Accordingly, to the extent that Arizona has some cognizable breach of contract claim based on Kirkland's failure to obtain some kind of tax exemption, Arizona has failed to demonstrate that it gave Kirkland written notice of that claim as required by Paragraph 21. Kirkland is therefore entitled to summary judgment on that portion of the breach of contract claim.

### C.  Good faith and fair dealing claim

Arizona asserts a claim under Colorado law's recognition of the implied covenant of good faith and fair dealing with regard to shallow cut depths and site access.

Under Colorado law, every contract contains an implied duty of good faith and fair dealing.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  That duty exists "to effectuate the intentions of the parties or to honor their reasonable expectations."  *Id.*  It may be invoked "when the manner of performance under a specific contract term allows for discretion on the part of either party" if "the parties, at formation, defer a decision regarding performance terms of the contract leaving one party with the power to set or control the terms of performance

after formation." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).   However, it does not interject new substantive terms into an agreement or cause a party to assume obligations that vary or contradict the contract's express provisions.  *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo.App. 1994).

Kirkland argues that Arizona cannot establish its claims for breach of the implied covenant of good faith and fair dealing because it cannot show that Kirkland exercised discretion over cut depths (which were dictated by the project plans) or over the issue of site access (as Arizona decided to hand-carry explosives rather than demand better site access).

The contract in the record does not materially describe the relative obligations of Kirkland and Arizona.  (A variety of project documents and other materials the parties may have relied upon are deemed incorporated by reference in the contract, but have not provided to the Court.)  The parties appear to generally agree that the overarching project documents required that Kirkland to deliver to the project owner a cut that had been excavated to a certain specific depth.  Taking Arizona's evidence in the light most favorable to it, the record indicates that although Kirkland had no discretion as to the final depth of the cut, it did possess the discretion to determine how much of that depth it would remove through its own excavation efforts and how much of that depth it would call upon Arizona to clear.  This is consonant with opinion evidence tendered by Arizona (that has not been challenged by Kirkland under Fed. R. Evid. 702).  Robert Cummings states in an affidavit that "it is generally understood in the heavy construction industry that where rock not requiring blasting overlies rock that does, . . .a decision is made [by a contractor like Kirkland] as to when to stop ripping and switch to blasting."  Among the factors that the contractor will consider are "the practicalities of conducting effective blasting," and that "when it is apparent that the excavation limits will not be

reached without blasting, it is prudent to leave sufficient cut depth and volume to promote effective blasting." Thus, Arizona has come forward with evidence to indicate that Kirkland had the discretion to perform less excavation on its own in order to facilitate more effective blasting by Arizona. This is sufficient discretion by Kirkland in directing the performance of the contract to support a claim for breach of the implied covenant of good faith and fair dealing.[10]

The same cannot be said of Arizona's second good faith and fair dealing claim – that Kirkland breached that implied covenant when exercising its discretion to provide site access. As noted above, the implied covenant of good faith and fair dealing cannot be relied upon to modify the express terms of the contract. Here, the parties' contract specifically defined the measure of Kirkland's obligations when it came to providing site access: Kirkland was required to provide "access . . . suitable for tracked drills and support vehicles on their own power." This standard is not subject to the exercise of discretion; either the tracked drills and support vehicles were able to reach the work site under their own power, or they were not. The focus on what Arizona elected to do when faced with an apparent breach by Kirkland of this requirement misses the point that the contract standard itself did not grant Kirkland discretion to decide whether access was sufficient or not. Accordingly, because the contract did not call for Kirkland to exercise discretion in meeting this obligation, Kirkland is entitled to summary judgment on the claim for breach of the implied covenant of good faith and fair dealing as it relates to the issue of site access.

---

[10] The Court emphasizes that it has limited its inquiry to the specific element – discretion in performance – raised by Kirkland in its motion. The Court offers no opinion as to whether Arizona's claim is otherwise viable.

**D.** *Quantum meruit*

Colorado law recognizes the doctrine of *quantum meruit* as an equitable theory of recovery that arises out of the need to avoid unjust enrichment to a party in the absence of an actual agreement to pay for services rendered. *Melat, Pressman & Higbie, LLP v. Hannon Law Firm, LLC*, 287 P.3d 842, 847 (Colo. 2012). It arises "when the parties have no express contract or have abrogated it." *Id.* To establish a claim of *quantum meruit*, Arizona must show: (i) that Kirkland received a benefit, (ii) at Arizona's expense, and (iii) that the circumstances would make it unjust for Kirkland to retain that benefit without paying. *Id.*

In its response brief, Arizona limits its discussion of this claim to the issue involving Kirkland's use of the impact hammer. Because, as discussed above, the Court finds that Arizona has demonstrated that the parties had an express (albeit oral) agreement concerning Kirkland's rental of that hammer, Arizona's *quantum meruit* claim fails. Kirkland is entitled to summary judgment on this claim.

**E.  Miller Act claim**

Kirkland seeks summary judgment on Arizona's claim under the Miller Act – essentially a claim against a surety bond posted by Kirkland – based on Kirkland's failure to pay the claims discussed herein. Kirkland's argument with regard to this claim is essentially derivative of its contention that it is entitled to summary judgment on all of Arizona's claims. Because the Court finds that some of Arizona's claims must proceed to trial, the Miller Act claim also proceeds.

<u>**CONCLUSION**</u>

For the foregoing reasons, Kirkland's Motion for Summary Judgment **(# 66)** is **GRANTED IN PART** and **DENIED IN PART** as discussed herein. The parties shall promptly begin preparation of a Proposed Pretrial Order, specifically conforming to the requirements set

forth in the Trial Preparation Order – Civil **(# 23)**, and shall jointly contact chambers to schedule

a Pretrial Conference.

Dated this 17th day of December, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge